ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Circle, LLC | ) ASBCA No. 58575 |
| | ) |
| Under Contract No. W912P8-04-C-0004 | ) |

APPEARANCES FOR THE APPELLANT: Thomas F. Gardner, Esq.
Douglas A. Kewley, Esq.
W. Lee Kohler, Esq.
  Gardner & Kewley, APLC
  Metairie, LA

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
  Engineer Chief Trial Attorney
William G. Meiners, Esq.
  Engineer Trial Attorney
  U.S. Army Engineer District, New Orleans

OPINION BY ADMINISTRATIVE JUDGE SCOTT
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
AND APPELLANT'S MOTIONS TO STRIKE

Circle, LLC (Circle) appealed under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, from the contracting officer's (CO's) final decision denying its $1,652,739.64 claim based upon the U.S. Army Corps of Engineers' (Corps') alleged constructive change to the subject contract involving a canal improvement project in Louisiana. The parties filed cross-motions for summary judgment on liability. Circle also moved to strike portions of declarations the Corps submitted and of its statement of genuine issues of material fact. For the reasons stated below, we deny Circle's motions and we grant the Corps' cross-motion for summary judgment.

APPELLANT'S MOTIONS TO STRIKE

Preliminarily, we resolve Circle's motion to strike certain paragraphs in declarations submitted by the Corps. Circle contends that they are inadmissible under FED. R. CIV. P. 56(c)(4) and FED. R. EVID. 602. Rule 56(c)(4) states that:

> An affidavit or declaration used to support or oppose a
> motion must be made on personal knowledge, set out facts
> that would be admissible in evidence, and show that the

> affiant or declarant is competent to testify on the matters stated.

FED. R. EVID. 602 states in pertinent part that:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.

Circle complains about statements such as the declarant has no personal knowledge, no knowledge, or no recollection of a specific meeting, submittal, submittal rejection, or direction by the Corps that Circle alleges occurred at the meeting. Circle also contends that many of the alleged factual disputes in the Corps' Statement of Genuine Issues of Material Fact should be stricken because they are either based upon inadmissible averments in the Corps' declarations or upon mere denials, which are insufficient to defeat summary judgment.

The Corps responds that Circle has misinterpreted the cited Rules and that a declarant's statement about the declarant's lack of knowledge or recollection of a matter is a statement necessarily founded upon the declarant's own personal knowledge. The Corps asserts that the declarations are in direct response to Circle's allegations that three of the Corps' declarants attended a specific meeting, referred to by Circle as the "Expectations Meeting" (app. mot., vol. 2, tab D (hereafter O'Brien aff.) ¶ 8), at which two of them required Circle to use a particular computer program for design work. The Corps contends that the declarations establish that Circle's allegations that the events occurred are uncorroborated. The Corps cites to several cases, including *Thai Hai*, ASBCA No. 53375, 02-2 BCA ¶ 31,971, *recon. denied*, 03-1 BCA ¶ 32,130, *aff'd*, *Thai Hai v. Brownlee*, 82 F. App'x 226 (Fed. Cir. 2003) (unpublished), in which it alleges that a witness's lack of recollection was treated as admissible evidence. Circle argues that the cases are distinguishable.

The Corps also opposes Circle's motion to strike much of its Statement of Genuine Issues of Material Fact. The Corps contends that the issues are based upon the documentary record, or upon a lack of documentation to support Circle's claim, in addition to the Corps' declarations. The Corps cites to FED. R. CIV. P. 56(c)(1)(A) and (B), which state:

> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

2

> (A) citing to particular parts of materials in the record, including...documents,...affidavits or declarations,...interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Circle counters, *inter alia*, that the lack of documentation is not necessarily relevant because the Corps has admitted to having lost some records in Hurricane Katrina.

The Federal Rules of Civil Procedure do not apply to the Board as an administrative tribunal but we may look to them for guidance, particularly in areas our rules do not specifically address. *Thai Hai*, 02-2 BCA ¶ 31,971 at 157,920. Similarly, Board Rule 10(c) (addressing hearings) notes the fact that the Federal Rules of Evidence are not binding upon the Board but they may guide the Board's rulings. Board Rule 7 provides that, in deciding motions for summary judgment, we look to FED. R. CIV. P. 56 for guidance. Regarding the admissibility of proffered evidence, it is up to the Board in its sound discretion to determine what evidence is admissible and the weight to be given it. *Laguna Construction Co.*, ASBCA No. 58324, 14-1 BCA ¶ 35,748 at 174,949 (addressing appellant's motion to strike); *see* Board Rules 10(c), 11(d), 13(d).

The Corps' declarants include the administrative contracting officer (ACO), who averred that he was unaware of the alleged Expectations Meeting or of any documentation about it, and the three Corps employees alleged by Circle to have attended the meeting. The declarants do not deny that there were meetings with Circle involving its submittals; they deny knowledge or recollection of a specific meeting on or about the date alleged by Circle and Circle's contentions as to what occurred at the meeting. Indeed, one of the two Circle affiants said to have attended the meeting averred that he did not recall the exact date of the meeting, but he named a date based upon the best of his recollection (O'Brien aff. ¶ 8).

The alleged Expectations Meeting, submittal, submittal rejection, and Corps direction, and other disputed matters referred to by Circle and the Corps in connection with Circle's motions to strike, are pertinent to the Board's analysis of Circle's claim. We deny Circle's motions to strike the disputed portions of the Corps' declarations and of its Statement of Genuine Issues of Material Fact.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE SUMMARY JUDGMENT MOTIONS

The parties have submitted affidavits or declarations in support of their motions. The following facts, derived from those submittals and the proposed facts alleged by the parties and the portions of the record to which they refer, are undisputed or uncontroverted unless otherwise indicated.

1. On 15 January 2003 the Corps issued a sealed bid solicitation for Phase 1 of a Southeast Louisiana (SELA) urban flood control project involving improvements to the Two Mile Canal in Jefferson Parish, Louisiana (R4, tab 4 at 3). The work included, *inter alia*, constructing a concrete flume in the canal. The contractor was required to install a Temporary Retaining Structure (TRS), consisting of temporary sheet pile, to stabilize the canal while the flume was being constructed. It was the contractor's responsibility to design the TRS and select sheet pile capable of satisfying certain minimum performance criteria in specification section 02252. (R4, tab 1 at 2, ¶ 1; app. statement of undisputed facts (AUF) ¶¶ 2-5; gov't resp. to app's proposed facts (GRF) ¶¶ 2-5)

2. The solicitation and eventual contract contained the following provisions:

a. Federal Acquisition Regulation (FAR) 52.243-4, CHANGES (AUG 1987), which provides in pertinent part:

> (a) The [CO] may, at any time,...by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes—
>
> (1) In the specifications (including drawings and designs);
>
> (2) In the method or manner of performance of the work;
>
> ....
>
> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the [CO] that causes a change shall be treated as a change order under this clause; provided that the Contractor gives the [CO] written notice stating
>
> (1) the date, circumstances, and source of the order and
>
> (2) that the Contractor regards the order as a change order.

4

(c) Except as provided in this clause, no order, statement, or conduct of the [CO] shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract,...the CO shall make an equitable adjustment.... However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required....

(e) The Contractor must assert its right to an adjustment under this clause within 30 days after

...(2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the [CO] a written statement describing the general nature and amount of the proposal, unless this period is extended by the Government.

(R4, vol. II, app'x at 77-78)

b. Defense Federal Acquisition Regulation Supplement (DFARS) 252.201-7000, CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991), which states:

(a) "Definition. Contracting officer's representative" means an individual designated in accordance with subsection 201.602-2 of the [DFARS] and authorized in writing by the [CO] to perform specific technical or administrative functions.

(b) If the [CO] designates a [CO's] representative (COR), the Contractor will receive a copy of the written designation. It will specify the extent of the COR's authority to act on behalf of the [CO]. The COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract.

(R4, vol. II, app'x at 94)

5

c. Specification section 00010, Bidding Schedule, Note 2, which states that "[w]ithin seven (7) days after issuance of the NTP [notice to proceed], the Contractor shall initiate a meeting to discuss the submittal process with the Area or Resident Engineer or his authorized representative" (R4, vol. II, app'x at 00010-5).

d. Specification section 02252, TRSs, which states in part:

1.1 SCOPE

This work shall consist of designing, furnishing, installing, maintaining, and subsequently removing all [TRSs] required to complete this project. The Contractor shall be solely responsible for the design, layout, construction, maintenance, and subsequent removal and disposal of all elements of the [TRSs].

....

1.3 SUBMITTALS

Submittals shall be in accordance with Section 01330 – "SUBMITTAL PROCEDURES". No work shall proceed until the submittals have been reviewed and approved by the [CO]....

(1) Design calculations.

(2) Shop Drawings.... These shop drawings shall bear the stamp and signature of the Registered Professional Engineer. These drawings shall clearly show:

....

(b) Material grade, weight, length and designation of steel sheet pile section(s) used.

....

1.4 DESIGN CALCULATIONS

1.4.1 Design Procedures

The Contractor shall follow design procedures using the method of developing soil pressure for estimating the external forces, set forth in "Steel Sheet Piling Design Manual" excluding [various methods]. The design performed by the Contractor must evaluate the overall stability and sizing of the sheet piling and other structural elements for the [TRSs]. The Contractor shall use and rely upon the soil borings, design sheer strength profile(s) and unit weight data presented in the plans and/or in the figure(s) attached...for its design. The structure shall meet all the requirements of Corps of Engineers Safety Manual EM 385-1-1 for fall protection and ingress and egress.

....

1.4.3 Sheet Pile Wall Design

The design of the sheet pile walls shall be developed using a method of analysis indicated in paragraph 1.4.1....

(R4, vol. II, app'x at 02252-1 to -2)

3. The parties agree that, as part of Circle's bid preparation, Mr. Minor Hines, a Circle project manager, prepared a hand sketch depicting Circle's proposed TRS design, which was based upon the use of AZ18x60 sheet piles (app. mot., vol. 1, attach. A (hereafter Cavalier aff.), ex. 1, attach. B (hereafter Duong aff.) ¶ 2; AUF ¶¶ 11, 12; GRF ¶¶ 11, 12). The government contends that this TRS design did not comply with contract requirements (GRF ¶ 12). Mr. Ivy Cavalier, currently a Circle equipment manager, who assisted in bid preparation in August 2003, states in his affidavit that the sketch was prepared after Mr. Hines consulted with Mr. J. Michael Dixon, P.E., Circle's engineering consultant. Mr. Co Duong, a Circle estimator from 1994 to 2006, similarly states in his affidavit, as does Circle's president, Mr. M. J. Wolfe, Jr. (Cavalier aff. ¶¶ 1-3; Duong aff. ¶¶ 1, 4, 5; app. mot., vol. 1, tab V, attach. C (hereafter Wolfe aff.) ¶¶ 1, 4, 6; AUF ¶ 11) Mr. Dixon died in 2004 (app. mot. at 16). Mr. Hines did not submit an affidavit. For lack of knowledge, the Corps disputes that the sketch was prepared after consultation with Mr. Dixon (GRF ¶ 11).

4. Mr. Cavalier prepared an AutoCad drawing, based upon Mr. Hines' hand sketch, depicting Circle's planned TRS design, using AZ18x60 sheet piles. On 22 August 2003 Mr. Cavalier faxed a copy of his AutoCad drawing, depicting Circle's planned TRS design, to Mr. Dixon for his review and approval. On 25 and 26 August

7

2003 Mr. Hines faxed to Mr. Dixon solicitation pages containing soil data related to the project. (Cavalier aff. ¶ 5, ex. 2; Duong aff. ¶ 7, exs. 3, 4; AUF ¶¶ 13-16; GRF ¶¶ 13-16)

5. Circle contends that "[a]fter performing design calculations to verify Circle's planned TRS design, Mr. Dixon reported back to Circle that AZ18x60 sheet piles would work for the TRS" (AUF ¶ 17). Circle cites to Mr. Cavalier's statement that:

> Mr. Dixon performed design calculations based on the [TRS] depicted in Exhibit No. 2. Mr. Dixon reported back to Circle that Circle's proposed [TRS], using AZ18x60 sheet piling, would meet the requirements of project specifications.

(Cavalier aff. ¶ 6) Mr. Cavalier does not identify to whom Mr. Dixon reported or when and there is no contemporaneous documentary evidence of record of Mr. Dixon's calculations. The Corps disputes Circle's contention on the ground that the Corps has not seen, and has no knowledge, that Mr. Dixon performed the calculations or that the TRS design complied with the contract (GRF ¶ 17).

6. Circle contends that, only after consulting with Mr. Dixon, and obtaining his assurance that a TRS constructed with AZ18x60 sheet piles "would have complied with the Project specifications," did it base its bid upon the use of those sheet piles (AUF ¶ 18). The Corps disputes Circle's contention on the ground that it has not seen, and has no knowledge, of what, if any, consultation occurred between Mr. Dixon and Circle prior to Circle's decision to use AZ18x60 sheet piles for its TRS or that the TRS design allegedly approved by Mr. Dixon complied with the contract (GRF ¶ 18).

7. Sheet pile cost is based upon a unit price per pound of steel used. Larger sheet piles are more expensive than smaller ones. (AUF ¶ 20; GRF ¶ 20) On 27 August 2003 Circle received a proposal from Skyline Steel (Skyline) to sell AZ18x60 sheet piles. Circle prepared its bid for the TRS work based upon the use of AZ18x60 sheet piles. It based its material cost estimate upon Skyline's quotation. It based its estimated labor and equipment costs upon its historical production rates associated with AZ18x60 sheet piles. (Duong aff. ¶¶ 12-13, exs. 9-12; AUF ¶¶ 24-26; GRF ¶¶ 24-26)

8. Circle's bid preparation worksheets, bid summary, and pre-construction budget reflect that its estimated TRS costs included, among other things, purchasing AZ18 sheet piles and installing two levels of bracing (Duong aff. ¶¶ 13-15, exs. 9, 10; AUF ¶¶ 27-30; GRF ¶¶ 27-30).

9. On 6 October 2003 Circle submitted its project bid in the amount of $12,075,806.13. The portion of the price attributable to the TRS scope of work was $2,456,773.99. Circle's estimated cost (excluding markup) for the TRS work, as

8

reflected in its bid worksheets and pre-construction budget, was $2,305,468.99. (Duong aff. ¶¶ 13-15; Wolfe aff. ¶ 7; AUF ¶¶ 32-34; GRF ¶¶ 32-34)

10. On 22 October 2003 the Corps awarded the contract to Circle (R4, tab 5). Circle then negotiated further with Skyline for the TRS sheet piles. Mr. Matt O'Brien, a Circle project manager from 2003 to 2013, states that he requested 58-foot sheet pile as a ruse, knowing that Skyline would provide stock-length 60-foot pile for the price of the shorter ones, rather than custom fabricate. Circle received a revised proposal from Skyline for AZ18x58 sheet pile and ordered it on 7 November 2003. (App. supp. R4, tabs 7, 8; O'Brien aff. ¶¶ 4, 7; AUF ¶¶ 36-38, 41-42; GRF ¶¶ 36-37, 41-42) Circle has not provided evidence of whether Skyline actually delivered 60-foot pile. The Corps disputes the "ruse" claim for lack of knowledge or information (GRF ¶ 38).

11. On 3 November 2003 Circle acknowledged receipt of the CO's 22 October 2003 letter to Mr. Steve Hinkamp, resident engineer for the Corps' Southeast Louisiana-Jefferson Parish Resident Office (SELA-J), appointing him as the contract's ACO. The letter advised that the authority was not redelegable; as ACO, Mr. Hinkamp could modify construction contracts within the contract scope under the Changes and other named clauses provided that no individual contract action under the clauses could exceed $100,000; and he was to record all actions he took in administering the contract, in accordance with applicable regulations. (R4, tab 8 at 5-6; gov't mot. and opp'n, tab D (hereafter Hinkamp decl.) ¶¶ 1, 2)

12. On 5 November 2003 Circle and the Corps held a submittals meeting, per contract section 00010, Bidding Schedule, Note 2, to discuss the submittal process. The Corps informed Circle that additional submittal meetings could be arranged at its discretion to expedite the submittal review process for certain work components, including the TRS. (R4, vol. II, app'x at 00010-5; app. supp. R4, tabs 30, 31)

13. The Corps held the Pre-Construction Conference on 18 November 2003. ACO Hinkamp avers in his declaration that, at the meeting, he informed Circle that the only two persons authorized to make changes to the contract were the CO and himself as ACO and that, if Circle believed that any instructions given to it by any other person constituted a change to the contract, the matter should be brought to his attention. (R4, tab 9; Hinkamp decl. ¶ 3, ex. 1; AUF ¶ 43; GRF ¶ 43) Mr. Hinkamp's 12 January 2004 minutes of the pre-construction conference state:

> I pointed out that Diane Pecoul is the [CO], and that I am the [ACO] and SELA Resident Engineer. Ms. Pecoul and myself are the only two people who have the authority to make changes to the contract. Instructions given to you by anyone else should be brought to my attention if you consider them to be a change to the contract.

9

(R4, tab 9 at 6) The minutes record that Messrs. O'Brien, Duong and others attended for Circle. On 15 January 2004 Mr. O'Brien signed an acknowledgment to the Corps that he concurred with the minutes, without exception. (R4, tab 9 at 2, 12) Circle agrees with the foregoing (app. resp. to gov't proposed additional facts (ARF), ¶¶ 129-31).

14. Mr. O'Brien avers in his affidavit:

> 8. After the Pre-Construction Conference, which was held on November 18, 2003, I took the Corps' recommendation and scheduled an informal meeting with the Corps to discuss the Corps' expectations regarding the TRS submittals process ("Expectations Meeting"). I do not recall the exact date on which the Expectations Meeting occurred. However, to the best of my recollection, the Expectations Meeting occurred on the Thursday following the Pre-Construction Conference, i.e., November 20, 2003.

> 9. On or about November 20, 2003, I attended the Expectations Meeting with the Corps to informally discuss the Corps' expectations regarding the TRS submittals. The Expectations Meeting was held in the morning at the SELA offices in the Joseph Yenni Building in Harahan, Louisiana. Mr. Co Duong and Mr. J. Michael Dixon also attended the Expectations Meeting on behalf of Circle. Mr. Robert Guillot, Mr. Frederick Young and Mr. Shung Chiu attended the Expectations Meeting on behalf of the Corps.

> 10. Mr. Dixon brought with him to the Expectations Meeting copies of his TRS design and his TRS hand calculations. Mr. Dixon's TRS design was based on the use of AZ18x60 sheet piles and two levels of bracing. Mr. Dixon presented copies of his TRS design and hand calculations to Mr. Young and Mr. Chiu.

> 11. During the Expectations Meeting, Mr. Young and Mr. Chiu reviewed and discussed Mr. Dixon's original TRS design and hand calculations. However Mr. Young and Mr. Chiu refused to accept Mr. Dixon's original TRS design and hand calculations for an official review.

10

12. During the Expectations Meeting, Mr. Young and Mr. Chiu advised Circle that Circle would need to submit new TRS calculations which had to be performed using the Corps' proprietary CWALSHT software program. Mr. Young and Mr. Chiu explained that the TRS design calculations needed to be performed using CWALSHT because the Corps intended to use CWALSHT to conduct its review of Circle's TRS design calculations.

Mr. O'Brien does not allege that the CO or the ACO was present at the alleged Expectations Meeting or at any other meeting at which any Corps employee is said to have instructed Circle that its TRS calculations must be performed using CWALSHT.

15. Mr. Duong avers in his affidavit:

16. On or about November 20, 2003, I attended a meeting with the Corps to discuss the Corps' expectations regarding Circle's TRS submittals ("Expectations Meeting"). The Expectations Meeting was held in the morning at the SELA offices in the Joseph Yenni Building in Harahan, Louisiana. Mr. Matt O'Brien and Mr. J. Michael Dixon also attended the Expectations Meeting on behalf of Circle. Mr. Robert Guillot, Mr. Frederick Young and Mr. Shung Chiu attended the Expectations Meeting on behalf of the Corps.

17. Mr. Dixon brought with him to the Expectations Meeting copies of his TRS design and his TRS hand calculations. Mr. Dixon's TRS design was based on the use of AZ18x60 sheet piles. Mr. Dixon presented copies [of] his TRS design and hand calculations to Mr. Guillot, Mr. Young and Mr. Chiu. Mr. Guillot, Mr. Young and Mr. Chiu refused to accept Mr. Dixon's TRS design and hand calculations for an official review. Mr. Guillot, Mr. Young and Mr. Chiu advised that Circle would need to submit new TRS calculations.

Mr. Duong does not allege that the CO or the ACO was present at the alleged Expectations Meeting or at any other meeting at which any Corps employee is said to have instructed Circle that its TRS calculations must be performed using CWALSHT. Mr. Duong does not allege that any of the Corps personnel attending the meeting instructed or directed the contractor or its design consultant that Circle must use the Corps' CWALSHT program for its TRS design.

11

16. ACO Hinkamp avers in his declaration:

> 4. I have no knowledge or recollection of an "expectations meeting" that is alleged to have occurred on or about November 20, 2003 between representatives of Circle and the [Corps], nor am I aware of any documentation indicating that such a meeting did take place.
>
> 5. I am aware of allegations made by Circle that, at a meeting on or about November 20, 2003, two Corps employees, Frederick Young and Shung Chiu, structural engineer and geotechnical engineer, respectively, instructed or directed Circle that it was required to use the CWALSHT computer program to design its [TRS].
>
> 6. I have no personal knowledge that Frederick Young or Shung Chiu instructed or directed Circle that it was required to use the CWALSHT computer program to design its TRS. Additionally, no employee of the [Corps] has ever informed me that such direction or instruction was ever given to Circle by Mr. Young or Mr. Chiu.
>
> 7. The only persons who had authority to modify the terms of [the subject contract] were [the CO and the ACO]. Neither Frederick Young, Shung Chiu, nor Robert Guillot, who is also alleged to have attended the purported meeting of November 20, 2003, had any authority whatsoever to modify the terms and conditions of [the subject contract]. In particular, neither Frederick Young, Shung Chiu, nor Robert Guillot had any authority to instruct or direct Circle that it was required to use the CWALSHT computer program to design its TRS.
>
> 8. The first time I became aware of the allegations that Corps employees had instructed or directed Circle that it was required to use the CWALSHT computer program to design its TRS was when Circle submitted its Request for Equitable Adjustment ("REA"), dated April 13, 2009....
>
> ....

10. The contractor was required to provide all submittals to my attention at the government's resident office (SELA-J), on ENG Form 4025. The SELA-J Office would distribute the submittal to the appropriate review parties (in-house and/or A-E design office as well as to Jefferson Parish, the local sponsor). Review comments from appropriate offices would be consolidated by the SELA-J Resident Office and a signed response would be returned by the ACO to the Contractor on the same ENG Form 4025. The contractual requirements for submittal procedures are set forth in Section 01330 of the contract, entitled "Submittal Procedures".

11. Frederick Young and Shung Chiu were Corps employees and engineers whose duties included reviewing and providing comments on TRS submittals provided by Circle. Mr. Young and Mr. Chiu provided comments and made recommendations to me whether to approve or reject TRS submittals, but they had no authority themselves to approve or reject submittals. Only the [CO] and [ACO] had authority to approve or reject submittals.

12. Under the process set forth in the contract, and as discussed at the submittals meeting of November 5, 2003, all official submittals were required to be submitted on ENG Form 4025 and the signed response by the ACO was required to be returned to the Contractor on this same ENG Form 4025. This process is established so that the Contractor receives only one official response from a properly designated government official, in this case, the ACO.

Circle generally agrees with Mr. Hinkamp's statements in his declaration concerning the submittal process. It alleges that the ACO authorized it to meet directly with the Engineering Division to expedite the TRS design and submittal review. (ARF ¶ 137)

17. Mr. Guillot, a Corps employee assigned to the SELA Urban Flood Protection Resident Office during the project, who oversaw the work of the project engineer and construction inspectors on several drainage improvement projects (gov't mot. and opp'n, tab E (hereafter Guillot decl.) ¶¶ 1-3), avers in his declaration:

4. While I did attend meetings related to the [TRS] for [the subject contract], I have no recollection of attending a TRS meeting on or about November 20, 2003.

13

5. With regard to the TRS meetings that I did attend, I have no knowledge or recollection that either Frederick Young or Shung Chiu rejected a TRS submittal informally provided by Circle.

6. With regard to the TRS meetings that I did attend, I have no knowledge or recollection that either Frederick Young or Shung Chiu instructed or directed Circle that it was required to use the CWALSHT computer program to design its TRS.

7. With regard to the TRS meetings that I did attend, I have no knowledge or recollection that either Frederick Young or Shung Chiu instructed or directed Circle that if it did not use the CWALSHT computer program to design its TRS, its TRS submittal would be rejected.

8. Neither I, nor Frederick Young, nor Shung Chiu had authority to modify [the subject contract].

9. Neither I, nor Frederick Young, nor Shung Chiu had authority to approve or [reject] submittals under [the subject contract].

18. Mr. Young, a Corps structural engineer until 2006, who was assigned to review the structural design aspects of Circle's TRS submittals (gov't mot. and opp'n, tab F (hereafter Young decl.) ¶¶ 2, 3), avers in his declaration:

4. While I did attend meetings related to the [TRS] for [the subject contract], I do not recall attending a TRS meeting on or about November 20, 2003.

5. I do not recall that, at a meeting on or about November 20, 2003, Mr. Michael Dixon, P.E., informally submitted a TRS design using...AZ18 sheet pilings to me.

6. With regard to the TRS meetings that I did attend, I have no recollection that I, Shung Chiu or anyone else ever rejected a TRS submittal informally provided by Circle on November 20, 2003.

7. With regard to the TRS meetings that I did attend, I have no knowledge or recollection that I or anyone else

14

instructed or directed Circle that it was required to use the CWALSHT computer program to design its TRS.

8. With regard to the TRS meetings that I did attend, I never instructed or directed Circle that if it did not use the CWALSHT computer program to design its TRS, its TRS submittal would be rejected.

9. I never had authority to modify [the subject contract].

10. My role in the submittals process for [the subject contract] was to review TRS submittals on behalf of my office, make comments, and forward those comments to higher authority.

11. I did not have authority to approve or reject submittals under [the subject contract].

19. Mr. Chiu, a Corps geotechnical engineer until his retirement in 2012, assigned to review the geotechnical design aspects of Circle's TRS submittals (gov't mot. and opp'n, tab G (hereafter Chiu decl.) ¶¶ 1-3), avers in his declaration:

4. While I did attend meetings related to the [TRS] for [the subject contract], I have no recollection of attending a TRS meeting on or about November 20, 2003.

5. I have no recollection that, at a meeting on or about November 20, 2003, Mr. Michael Dixon, P.E., informally submitted a TRS design to me or Frederick Young that allowed for the use of AZ18 sheet pilings.

6. With regard to the TRS meetings that I did attend, I have no knowledge or recollection that I, Frederick Young or anyone else ever rejected a TRS submittal informally provided by Circle.

7. With regard to the TRS meetings that I did attend, I have no knowledge or recollection that I, Frederick Young or anyone else instructed or directed Circle that it was required to use the CWALSHT computer program to design its TRS.

15

8. With regard to the TRS meetings that I did attend, I have no knowledge or recollection that I, Frederick Young or anyone else instructed or directed Circle that if it did not use the CWALSHT computer program to design its TRS, its TRS submittal would be rejected.

9. Neither I nor Frederick Young had authority to modify [the subject contract].

10. My role in the submittals process for [the subject contract] was to review TRS submittals on behalf of my office, make comments, and forward those comments to higher authority.

11. Neither I nor Frederick Young had authority to approve or reject submittals under [the subject contract].

20. The Corps agrees that, after the pre-construction conference, meetings with Circle to discuss its TRS submittals occurred (*see* AUF ¶ 44; GRF ¶ 44). However, it disputes that: (a) a TRS submittals Expectations Meeting occurred on or about 20 November 2003 and the personnel named by Circle attended; (b) Mr. Dixon brought copies of the TRS design submittal package, including his calculations performed by hand, and he provided the package to the Corps' technical advisors; (c) Mr. Dixon's TRS design used AZ18x60 sheet piles and two levels of bracing; (d) during the meeting Circle and the Corps informally reviewed Mr. Dixon's TRS design, his calculations and assumptions, and the Corps became aware that Circle had based its bid price upon AZ18 sheet piling and that its design included two levels of bracing; and (e) during the meeting the Corps refused to accept Circle's TRS design submittal for an official review and instructed it and Mr. Dixon to perform new TRS calculations using only the Corps' proprietary CWALSHT software program, which the Corps intended to use to review the TRS design and Mr. Dixon's calculations (Hinkamp decl. ¶¶ 4-6, 8; Guillot decl. ¶¶ 4-7; Young decl. ¶¶ 4-8; Chiu decl. ¶¶ 4-8; gov't mot. and opp'n, ex. 5 at 5 (app. resp. to interrog. No. 2d.); AUF ¶¶ 45-56; GRF ¶¶ 45-56).

21. Circle has not controverted the Corps' asserted fact that no documentary evidence exists to corroborate Circle's statement that an "Expectations Meeting" occurred on or about 20 November 2003. Although Circle deems the point to be irrelevant, it "agrees that it has been unable to locate any contemporaneous documentation to corroborate the affidavit testimony of Matt O'Brien and Co Duong that the Expectations Meeting occurred." (ARF ¶ 116)

22. Circle acknowledges the following of the Corps' asserted facts, although it deems them irrelevant: (a) no Corps representative whom Circle alleges to have attended

an Expectations Meeting on or about 20 November 2003 recalls having attended such a meeting and Circle has no information with which to dispute their professed lack of recollection (but Circle asserts that Messrs. O'Brien's and Duong's affidavit testimony establishes that the Corps personnel were there) (ARF ¶ 117); (b) Circle does not have proposed TRS design documents, including calculations and Mr. Dixon's original pre-bid design, said to have been submitted by him to the Corps in November 2003 (gov't mot. and opp'n, ex. 6 at 4 (app. resp. to doc. prod. req. No. 20); ARF ¶ 118); and (c) Circle has no documentation to confirm that Mr. Dixon's original TRS design was provided to the Corps personnel at the alleged Expectations Meeting (gov't mot. and opp'n, ex. 6 at 3 (app. resp. to interrog. No. 13(e)); ARF ¶ 135).

23. Circle contends that it is irrelevant (ARF ¶ 122), but it admits that Mr. Duong:

> [R]ecalls that the Corps rejected Mr. Dixon's hand calculations which were brought to the Expectations Meeting, but has no recollection of the reason the Corps rejected Dixon's hand calculations. Mr. Duong also has no recollection of the discussion of the use of CWALSHT software during the Expectations Meeting.

(Gov't mot. and opp'n, ex. 5 at 5 (app. resp. to interrog. No. 2d.))

24. Subject to an objection that it is a conclusory statement of law, Circle admits that Messrs. Young, Chiu and Guillot were not given express authority under the contract to modify it. However, Circle contends that Messrs. Young and Chiu "were cloaked with implied authority to effect constructive changes to the Contract." (ARF ¶ 128) Circle also "admits that Mr. Young and Mr. Chiu did not have express authority under the contract to approve or reject Circle's TRS submittals" (ARF ¶ 138). However, Circle contends that the Corps' Engineering Division made the ultimate determination whether Circle's TRS submittals complied with project specifications and the ACO was merely a conduit for delivering the Division's comments to Circle (*id.*). The Corps replies that the authority matter is not a conclusory legal statement but is based upon the factual record (gov't reply to app. resp. to gov't proposed additional facts ¶ 128).

25. CWALSHT is a proprietary software program created and owned by the Corps. It is intended to be used to perform the design and analysis of a cantilevered (unbraced) or anchored (single-braced) sheet pile retaining wall. It is not intended to be used to perform the design and analysis of a sheet pile retaining wall with multiple levels of bracing. (AUF ¶¶ 57-59; GRF ¶¶ 57-59)

26. On 1 and 2 December 2003 Mr. Dixon performed TRS design calculations, relying exclusively upon CWALSHT, including for construction stages that had two braces in the TRS (O'Brien aff., ex. 4; AUF ¶¶ 61-64; GRF ¶¶ 61-64). Circle contends

that these CWALSHT-based calculations determined controlling maximum moments that greatly exceeded the capacity of the AZ18 sheet piles contained in its original TRS design and required it to use AZ26x66 sheet piling. The Corps does not dispute this but it denies that evidence exists to establish that Circle's alleged original TRS design complied with contract requirements. (AUF ¶ 65; GRF ¶ 65)

27. On 4 December 2003 Circle issued a revised purchase order to Skyline for AZ26x66 sheet piling (O'Brien aff., ex. 6; AUF ¶¶ 67-68; GRF ¶¶ 67-68).

28. Circle states that, on 23 December 2003, Mr. Dixon's new TRS design and CWALSHT-based TRS calculations were part of TRS Submittal No. M14 (O'Brien aff., ex. 7; AUF ¶ 69). The Corps disputes this on the ground that the document is unsigned and the record reflects that the date of Circle's first TRS submittal, No. M14, was 13 January 2004 (R4, tab 11; Hinkamp decl. ¶ 13; Guillot decl. ¶ 11; GRF ¶ 69).

29. A TRS submittal meeting occurred on 30 December 2003. The Corps disagrees with Circle's characterization of any documents presented at the meeting as a "submittal." (R4, tab 1 at 5, ¶ 8 n.4, tab 10; AUF ¶ 70; GRF ¶ 70) The Corps agrees that, during the 30 December 2003 submittal discussion, it never advised Mr. Dixon that he should not have used CWALSHT to perform calculations for construction stages that included two levels of bracing in the TRS or that the use of CWALSHT to analyze a multi-braced TRS would calculate incorrect, materially greater moments on the TRS than would have been calculated using the methods authorized by the specifications. The Corps notes its continuing disagreement with any implication that use of CWALSHT to design the TRS was not permitted by the contract. (AUF ¶ 72; GRF ¶ 72)

30. On 31 December 2003 Mr. Dixon performed design calculations, using CWALSHT, to address comments by the Corps during the 30 December 2003 meeting. He used CWALSHT for all new TRS design calculations, including for stages that included two levels of bracing in the TRS, and identified the maximum moment on the sheet pile for each construction stage. (O'Brien aff., ex. 11 at 15311; AUF ¶¶ 73-76; GRF ¶¶ 73-76)

31. Circle contends that Mr. Dixon's 31 December 2003 revised TRS design and CWALSHT-based design calculations again determined controlling maximum moments that greatly exceeded the moment capacity of the AZ18 sheet piles contained in its original TRS design. The Corps disputes any implication that Circle's alleged original design complied with contract requirements, stating that it has never seen that TRS design and cannot comment upon its content. (AUF ¶ 77; GRF ¶ 77)

32. A TRS design meeting was held on 13 January 2004 (AUF ¶ 79; GRF ¶ 79). The parties dispute whether Circle's TRS Submittal No. M14, submitted and discussed at the meeting, was a supplemental submittal or the first TRS submittal received by the

18

Corps (AUF ¶¶ 78-81; GRF ¶¶ 78-81). On 30 January 2014 the Corps rejected TRS Submittal No. M14, with comments and instructions to re-submit (O'Brien aff., ex. 16; AUF ¶ 83; GRF ¶ 83). The Corps agrees that it never advised Mr. Dixon, including when it eventually approved Circle's submittal, that he should not have used CWALSHT to perform calculations for construction stages that had two levels of bracing in the TRS or that the use of CWALSHT to analyze a multi-braced TRS would calculate incorrect, materially greater moments on the TRS than would have been calculated using the methods authorized by the specifications. (AUF ¶¶ 82, 84, 93; GRF ¶¶ 82, 84, 93)

33. On 26 and 27 February 2004, using CWALSHT, Mr. Dixon performed new TRS calculations to support the revisions to his TRS design prompted by the Corps' comments upon TRS Submittal No. M14. He included calculations for three construction stages at two different locations in the canal and for the maximum moment on the sheet pile at each construction stage. At each location, the calculations for Stages 2 and 3 involved construction stages that included two levels of bracing in the TRS. Mr. Dixon's TRS design and calculations also determined a controlling maximum moment that exceeded the capacity of an AZ18 sheet pile. His calculations were part of Circle's TRS Submittal No. M14A, submitted on 2 March 2004. (O'Brien aff., exs. 19, 20; AUF ¶¶ 85-90; GRF ¶¶ 85-90) On 24 March 2004 the Corps approved submittal No. M14A, with exceptions (O'Brien aff., ex. 21; AUF ¶ 92; GRF ¶ 92).

34. Circle alleges that the Corps' instruction that it use CWALSHT necessitated its use of AZ26x66 sheet piles, which were longer, thicker, heavier and more expensive than AZ18x60 sheet piles, and required more time to drive and remove than it had estimated in its bid. The Corps denies any such instruction and disputes the extra time claim based upon lack of knowledge. (Hinkamp decl. ¶¶ 6, 7; Guillot decl. ¶¶ 6, 7; Young decl. ¶¶ 7, 8; Chiu decl. ¶¶ 7, 8; AUF ¶¶ 94-96; GRF ¶¶ 94-96)

35. By letter to ACO Hinkamp of 14 October 2004, Circle challenged a "conservative" vibration threshold in the specifications said to have caused it to upgrade its vibratory hammer. It also stated that it was "experiencing a very delayed process in removing [the TRS] sheet pile." (R4, tab 14 at 1) Circle alleged:

> In addition to the capital outlay for new equipment, we will continue to encounter the additional costs associated with slowed production. The successful hammer referenced above, will remove the sheeting, but at a much slower pace than originally anticipated, as the approved wall thickness and length of steel sheet pile drastically exceeds our bid day intent.
>
> Circle...and their TRS design consultant contend that demands to achieve approved TRS design exceeded the

19

requirements of specification section 02252 expressly Steel
Sheet Pile Design Manual, November 1987.

(*Id.* at 2) Circle noted that it expected to receive equitable restitution and reserved its right to file a claim. It also suggested that, to prevent further delays, damages and impacts, the TRS design presently approved might be re-evaluated by the Corps' chief design engineer. (*Id.*) Circle contends that this satisfied the Changes clause's notice requirements concerning alleged contract changes (*see* R4, tab 17; app. mot. at 20-23).

36. The project was completed on 7 July 2007 (AUF ¶ 98; GRF ¶ 98).

37. On 13 April 2009 Circle submitted an REA to the ACO in the amount of $1,652,740, alleging that Corps structural review criteria exceeded specification requirements, causing extra costs for additional and heavier materials, and additional equipment and labor to install and remove the TRS. Circle included a 3 April 2009 report by Grecon Construction Engineers, Inc. (Grecon), which concluded that the Corps required the use of the wrong calculation method, CWALSHT, which applies to anchored structures, not braced structures. Grecon stated that this reduced the limits of the stress allowed by the specifications, causing the sheet pile used for the TRS to be longer than required by the specifications, with a greater section modulus than could have been anticipated at the time of bid. (R4, tab 17)

38. On or about 14 July 2009, the CO denied the REA, stating that Corps records showed that Circle had ordered 66-foot long AZ26 sheet piles prior to providing any TRS submittal. Also, its first submittal included calculations by Mr. Dixon dated 1 December 2003, nearly a month before the first TRS meeting, in which he had recommended 66-foot long AZ26 sheet pile based upon a design using CWALSHT. The CO contended that this was contrary to Circle's contention that it was forced into using that sheet pile. The CO also disagreed with most of Grecon's assertions. (R4, tab 18)

39. In a 5 August 2009 letter to the CO, Circle stated that it was not until its engineer's 8 January 2004 calculations implementing the 30 December 2003 meeting requirements that it was determined that an enhanced modulus and length would be required and Circle revised its sheet pile order (R4, tab 19). By letter to Circle on or about 21 August 2009, and subsequently, the CO requested documentation and a summary of how and when Circle's design changed based upon discussion with the Corps (R4, tabs 20-22). On 18 June 2010 Circle provided the Corps with records that it had originally placed an order for AZ18 sheet piles with Skyline and had later requested AZ26 sheet piles (O'Brien aff. ¶ 41, ex. 29; AUF ¶ 103; GRF ¶ 103).

40. During a 21 July 2010 meeting with the Corps to discuss the REA, Circle advised that, due to Mr. Dixon's death, its original TRS design and hand calculations were no longer available (R4, tab 23; O'Brien aff. ¶ 42; AUF ¶¶ 104-05; GRF ¶¶ 104-05). The

20

Corps asked it for calculations supporting its contention that, had it used calculations similar to those it had submitted on past Corps projects, not using CWALSHT, it would not have had to upsize the sheet pile from AZ18x60 to AZ26x66. The Corps suggested that the calculations should be available because the REA was based upon this contention and Grecon had referred to the calculations. (R4, tab 23)

41. The Corps agrees with Circle's statements that, on 13 September 2011, the Corps approved Circle's TRS design and calculations on the Two Mile Canal, Phase II project, which involved a separate canal reach, abutting that involved in this appeal. Circle's design for Phase II used AZ18x60 sheet piles for the TRS. The CO was the same one who denied Circle's claim at issue here and the ACO was again Mr. Hinkamp. (AUF ¶¶ 107-10; GRF ¶¶ 107-10) However, the Corps states that it:

> [D]isputes the implication that, because Circle's TRS design using AZ18 sheet pilings was approved on a different project, 8 years later, and at a different location along the same canal, Circle should have been allowed to construct its TRS for the subject project using AZ18 sheet pilings. The first TRS design that Circle submitted to the Corps for review on the instant contract did not propose the use of AZ18 sheet pilings, but AZ26 sheet pilings.... Further, differing soil conditions and differing requirements at different locations along the canal could easily explain why a TRS constructed of AZ18 sheet pilings would be acceptable at one location, but not another. [Citations omitted]

(GRF ¶ 108; *see also* Hinkamp decl. ¶¶ 13, 14; Guillot decl. ¶ 11)

42. Circle and the Corps exchanged correspondence concerning Grecon's calculations and Circle's REA from December 2010 to 2012 (R4, tabs 24-28). By letter to Circle dated 23 January 2012,[1] which she characterized as in response to Circle's request for reconsideration of its REA, the CO asserted:

> After reviewing numerous documents, submittals and discussions with the Government and A/E employees, I found no evidence indicating that you were forced into using the Government's program. Further, Circle claimed it bid the job based on another method besides CWALSHT, although no partial calculations were ever provided to support this claim.

---

[1]  As with other Corps correspondence, there is no clear date on the Board's copy of this letter, but the Corps' index to its Rule 4 file and Circle's 24 February 2012 response to the letter (R4, tab 28) indicate that it was dated 23 January 2012.

I allowed you to complete a design as you originally intended to support the contention that the sheet pile could have been lighter and shorter.

On December 21, 2010 you submitted your design. While the design methodology was supported by the contract specifications, the submittal contained errors and did not properly factor the soil strength. When these corrections were made, your originally intended design did not result in a shorter or lighter sheet pile section. On April 21, 2011 you were notified of these findings.

On November 17, 2011, rather than correcting the December 21, 2010 design; you submitted another design method.... I believe the Government has been quite liberal in allowing you to resubmit a different design methodology even [though] there is no evidence to suggest that you were forced to use CWALSHT.... At this point in time, it is not reasonable to believe that the latest iteration of your design method...is the one which you intended to use over eight years ago.

(R4, tab 27)  The CO denied Circle's request for reconsideration (*id.*).

43.  By letter of 24 February 2012, Circle disputed the CO's determinations and sought a final decision. On 20 June 2012, Circle submitted a certification that contained the elements required by the CDA. (R4, tabs 3, 28-29) On 29 November 2012 the CO issued her final decision denying Circle's claim for $1,652,739.64. The CO asserted that:

1. ...The flaw in your argument is that no Government representative <u>directed</u> you, or your design consultant, to use the CWALSHT program. At the pre-submittal meetings attended by your design consultant, it is entirely possible that a Government representative advised both you and your design consultant that the CWALSHT program was available to help a contractor prepare a design that incorporated steel sheet pile. However, I have found no evidence to suggest that a Government representative <u>directed</u> you or your design consultant to use the CWALSHT program [let] alone use it <u>in lieu of</u> the methodology specified in Section 02252, paragraph 1.4.1 of the Contract specifications. To the extent your design consultant elected to use the CWALSHT program as a design aid, I find that his choice was entirely voluntary.

22

2. Even if a Government representative had directed Circle, or its design consultant, to use the CWALSHT program, the individual had no authority to direct a change to the contract specifications.

(R4, tab 1 at 10) Circle timely appealed to the Board on 25 February 2013.

44. In January 2014 Circle engaged Mr. Peter Bowlin, a professional engineer employed by Ragland Aderman & Associates, Structural Engineering, to recreate the TRS design and hand calculations prepared by Mr. Dixon. The purpose was to demonstrate that a TRS complying with project specifications could have been constructed using AZ18x60 sheet pile, which Circle alleges it had originally planned to use to construct the TRS. Mr. Bowlin prepared a report dated 25 July 2014, which Circle submitted to the Corps on or about 25 September 2014. (App. mot., vol. 3, tab E, ¶¶ 1-4, ex. 1; AUF ¶¶ 112-14; GRF ¶¶ 112-14) Circle contends that the report's calculations demonstrate that a contract-compliant TRS could have been constructed using AZ18x60 sheet piles. The Corps disagrees and alleges that, regardless, they were presented over ten years after Circle's obligation to provide a contract-compliant TRS submittal and they are not relevant to the TRS design it submitted in 2003 or 2004, which had different jobsite conditions, nor to the design upon which it had based its bid. (*See* Hinkamp decl. ¶ 14; AUF ¶ 114; GRF ¶ 114)

## DISCUSSION[2]

### The Parties' Positions

Circle contends that the Corps constructively changed the contract when its engineers Young and Chiu allegedly summarily rejected Circle's AZ18x60 TRS design,

---

[2] The Board perceived a potential timeliness issue regarding Circle's claim. Although the court held in *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315 (Fed. Cir. 2014), that the CDA's six-year statute of limitations, 41 U.S.C. § 7103(a)(4)(A), is not jurisdictional, failure to meet a statute of limitations remains an affirmative defense. *See* FED. R. CIV. P. 8(c). Board Rule 6(b) calls for the government to set forth any affirmative defenses in its answer to the complaint. Although the Corps contends, and Circle disputes, that Circle did not comply with the notice requirements of the Changes clause and took over five years to notify the Corps of its alleged constructive contract change, the Corps has not alleged that Circle's claim to the CO was time-barred under the CDA. The Corps did not assert this affirmative defense in its answer or in response to Circle's summary judgment motion and has waived it. *See, e.g., Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1353 (Fed. Cir. 1999).

23

even though it complied with the specifications, solely because it had not used the Corps' CWALSHT software. Circle alleges that the engineers ordered it to submit new TRS design calculations using only CWALSHT, contrary to its plan to use hand calculations; this order impermissibly limited its options by prohibiting it from using other design methods allowed by the specifications; and it misrepresented that CWALSHT could be used to design a TRS that had multiple levels of bracing.

The Corps contends that it is entitled to summary judgment on either of two grounds. First, even assuming, for the sole purpose of the Corps' motion, that two Corps employees directed or instructed Circle to use the CWALSHT computer program (which the Corps "vigorously denies" (gov't cross-mot. at 3)), there was no constructive change to the contract because they lacked express or implied authority to modify it and their actions were not ratified by anyone who had such authority. Secondly, Circle must demonstrate that it had a contract-compliant TRS design that would have allowed it to construct the TRS with AZ18 sheet piles. There is no credible evidence to establish this. Moreover, Circle cannot prove that the alleged Corps action was the cause of its decision to construct the TRS with more costly AZ26 sheet piles.

In opposing Circle's motion for summary judgment, the Corps contends that, contrary to the requirements of the Changes clause, Circle did not provide timely notice of the alleged constructive change, and that most of the material facts necessary to support Circle's claim are in genuine dispute.

In its opposition to the Corps' cross-motion, on the authority issue, Circle alleges that an integral part of the duty assigned to the Corps' two technical personnel, to review Circle's TRS design submittals, included giving instructions and directions to Circle about its design. Thus, they had the implied authority to do so. Their erroneous CWALSHT directions, which were binding upon the Corps, required thicker and longer sheet piles than Circle had intended and were a constructive contract change. Circle concedes that it does not allege ratification (Circle's reply in support of its objects. and mots. to strike, at 3). Regarding the Corps' second contention, Circle alleges that it has demonstrated the viability of its AZ18 sheet piling design through its consultant's re-creation of Mr. Dixon's original design and because the Corps subsequently allowed the design on other project work.

The Corps replies that Circle has admitted that the employees who allegedly instructed it to use CWALSHT to design its TRS did not have the express authority to do so (*see* SOF ¶ 24; ARF ¶ 128), and there is no genuine issue that they lacked implied authority to modify the contract. Circle was directly notified that they lacked such authority at the outset of the contract. Lastly, the Corps expands upon its secondary contention that Circle has not produced a contemporaneous TRS design using AZ18 sheet piles, not based upon the CWALSHT program, that complied with the contract specifications.

## Summary Judgment Standards

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. We resolve any significant doubt over factual issues, and draw all reasonable inferences, in favor of the party opposing summary judgment. Cross-motions do not necessarily mean that summary judgment is appropriate. We evaluate each motion on its own merits. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390-91 (Fed. Cir. 1987); *Free & Ben, Inc.,* ASBCA No. 56129, 09-1 BCA ¶ 34,127 at 168,743. We do not resolve factual disputes but ascertain whether there is a genuine issue of material fact, which is one that might affect the outcome of the case. There is a genuine issue of material fact if the evidence is such that a reasonable fact finder could find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986); *MIC/CCS, Joint Venture,* ASBCA No. 58023, 14-1 BCA ¶ 35,678 at 174,636; *Free & Ben,* 09-1 BCA ¶ 34,127 at 168,742. Mere denials or conclusory statements are insufficient to defeat summary judgment. *Mingus Constructors,* 812 F.2d at 1390-91.

## Appellant's Motion for Partial Summary Judgment

Circle moves for summary judgment that a compensable constructive contract change occurred when Corps engineers Young and Chiu allegedly erroneously ordered it to use the Corps' CWALSHT program to design the TRS, which Circle had not intended to do, the contract did not require, and which misrepresented that the program was appropriate for the design work. A constructive change occurs when a contractor performs work beyond the contract requirements, without a formal order under the Changes clause, due either to an express or implied informal order from an authorized government official or to government fault. *Bell/Heery v. United States,* 739 F.3d 1324, 1335 (Fed. Cir. 2014); *International Data Products Corp. v. United States,* 492 F.3d 1317, 1325 (Fed. Cir. 2007); *Versar, Inc.,* ASBCA No. 56857 *et al.,* 12-1 BCA ¶ 35,025 at 172,122. To meet its burden to prove that it was subject to a constructive contract change on the basis it alleges, Circle must establish that:

> (1) [I]t was compelled by the government to perform work that was not required by the terms of the contract; (2) the person directing the change had contractual authority unilaterally to alter the contractor's duties under the contract; (3) the contractor's performance requirements were enlarged; and (4) the additional work was not volunteered, but was directed by a government officer.

*Mountain Chief Management Services, Inc.*, ASBCA No. 58725, 15-1 BCA ¶ 35,831 at 175,201 (quoting *Northrop Grumman Systems Corp. Space Systems Division*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,242-43).

As our Statement of Facts reflects, there are numerous genuine issues of material fact that preclude summary judgment in Circle's favor (*see, e.g.*, SOF ¶¶ 20-24). The key question of whether Corps engineers Young and Chiu directed or instructed Circle, at an Expectations Meeting, or at any time, that it must use the CWALSHT design program to design its TRS is strongly disputed. Circle's related contention that Messrs. Young and Chiu constructively changed the contract by misrepresenting the appropriateness of CWALSHT for Circle's design needs is inherently fact-based and disputed.

While the CO suggested in her final decision that, at pre-submittal meetings, it was possible that a government representative advised Circle and its design consultant that the CWALSHT program was available to help prepare a design that incorporated steel sheet pile, she also stated that she had found no evidence to suggest that a government representative directed the use of CWALSHT (SOF ¶ 43, *see also* SOF ¶ 42). ACO Hinkamp and Messrs. Guillot, Young and Chiu, have declared that they have no knowledge or recollection of any such direction (SOF ¶¶ 16-19). Even if those declarations were discounted, as Circle urges, and even if Messrs. Chiu and Young had purported to issue the direction Circle assigns to them, at the claimed Expectations Meeting or otherwise, the record establishes, and Circle concedes, that they did not have the express authority to do so (SOF ¶¶ 19-21, 24, 43).

Further, Circle's broad contentions about the engineers' implied authority lack evidentiary support. None of Circle's affiants aver that the engineers had such implied authority in their experience and, although discovery has occurred, Circle offers no material documentation to support its implied authority allegations. Circle cites to ACO Hinkamp's declaration concerning the submittal process for its proposition that he "merely acted as a conduit for delivering the Engineering Division's comments to Circle" (ARF ¶ 138). However, the declaration does not suggest that the engineers had implied authority to approve or reject Circle's submittals, let alone to direct Circle's design process. To the contrary, the ACO declared that Messrs. Young and Chiu "had no authority themselves to approve or reject submittals. Only the [CO] and [ACO] had authority to approve or reject submittals" and "[t]his process is established so that the Contractor receives only one official response from a properly designated government official, in this case, the ACO." (SOF ¶ 16, Hinkamp decl. ¶¶ 11, 12)

Even Mr. O'Brien, the only Circle affiant who claims the direction to use CWALSHT occurred, describes the alleged Expectations Meeting as "informal" (SOF ¶ 14, O'Brien aff. ¶¶ 8, 9). As Circle admits, Mr. Duong, the other testifying attendee from Circle, has no recollection concerning any discussion about the use of CWALSHT software during the Expectations Meeting (SOF ¶¶ 15, 23).

26

Circle acknowledges receipt of the CO's letter to ACO Hinkamp at the contract's outset advising that the ACO could modify construction contracts under the Changes and other clauses up to $100,000 but that the authority was not redelegable (SOF ¶ 11). Circle also agrees that the ACO advised it at the pre-construction conference that only the ACO and the CO were authorized to make changes to the contract (SOF ¶ 13).

The Board addressed the question of constructive changes and contracting authority in *ECC, International*, ASBCA No. 55781, 13 BCA ¶ 35,207, where the contractor contended that the government's construction representative/project engineer and its CORs had issued directives, including wrongful rejection of submittals, causing compensable changes. Citing *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339 (Fed. Cir. 2007), the Board held that, even if events had occurred as the contractor described them, and that they could otherwise constitute constructive contract changes, it was barred from recovery because none of the officials alleged to have changed the contract's requirements were authorized to modify it. 13 BCA ¶ 35,207 at 172,738; *see also States Roofing Corp.*, ASBCA Nos. 55500, 55503, 09-1 BCA ¶ 34,036 at 168,348 (appeal dismissed 333 F. App'x 526 (2009), to the same effect. The same is true here.

In *Cath*, the facts supporting a delegation of authority to modify the contract to a government representative other than the CO – in that case, the Navy's Resident Officer in Charge of Contracts (ROICC), who was also the Project Manager – were much stronger than here, where the individuals alleged to have had implied contract authority were engineers. Nonetheless, the court held that, "[b]ecause the contract explicitly reserved authority to modify the contract to the [CO], the ROICC did not have actual express or implied authority to direct the contractor to perform compensable contract changes." *Cath*, 497 F.3d at 1341. The court elaborated that:

> To demonstrate entitlement to an equitable adjustment, Cath must prove that the contract was modified by someone with actual authority. Where a party contracts with the government, apparent authority of the government's agent to modify the contract is not sufficient; an agent must have actual authority to bind the government. Such actual authority may be express or implied from the authority granted to that agent.

*Id.* at 1344 (citation omitted). The court pointed to the Changes and other clauses reserving authority to the CO to bind the government to contract modifications. Also, among other regulations, the court cited to 48 C.F.R. § 43.102(a) ("Only [COs] acting within the scope of their authority are empowered to execute contract modifications on behalf of the Government."). It also referred to the contract's DFARS 252.201-7000 clause, included in the instant contract as well, which provides that a COR "is not

27

authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract" (SOF ¶ 2b.).

Regarding the question of implied authority, the court stated that the Navy had some blame for contract confusion and the contractor had dutifully complied with the Navy's directions for day-to-day contract administration, but the court concluded:

> The problem is that these Navy directives contradicted the clear language of the contract and it is the contract which governs. The law and the unambiguous contract terms compel the result that we reach.
>
> Authority to bind the government may be implied when it is an integral part of the duties assigned to the particular government employee.... Here, the ROICC could not have had the *implicit* authority to authorize contract modifications because the contract language and the government regulation it incorporates by reference *explicitly* state that only the [CO] had the authority to modify the contract. Modifying the contract could not be "considered to be an integral part of [the ROICC project manager's] duties" when the contract explicitly and exclusively assigns this duty to the CO. We cannot conclude that the [ROICC project manager] had implied authority to direct changes in the contract in contravention of the unambiguous contract language.

*Cath*, 497 F.3d at 1346 (citations omitted). *Cath* controls here.

In sum, Circle has not proved, as a matter of fact or law, that engineers Young and Chiu had the implied authority to direct it to use the CWALSHT design program, or to issue the other alleged directives, even if they had attempted to do so. Accordingly, we deny Circle's motion for partial summary judgment on liability.

### The Government's Motion for Summary Judgment

On the other hand, the foregoing establishes that there is no genuine issue of material fact that the Corps' engineers lacked the authority, express or implied, to modify Circle's contract. Circle has conceded that they lacked the express authority to do so and that it was notified that no one, other than the CO and the ACO (up to a point), had the authority to change the contract. Circle's contentions that the engineers were cloaked with implied authority are conclusory and unsupported by material evidence. They do not rise to the level of a genuine issue of material fact.

Again, *Cath* controls and the Corps is entitled to judgment as a matter of law. Accordingly, we grant the Corps' motion for summary judgment.[3]

## DECISION

We deny Circle's motions to strike and for partial summary judgment and we grant the government's cross-motion for summary judgment. The appeal is denied.

Dated: 1 July 2015

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58575, Appeal of Circle, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

---

[3] In view of our disposition, we do not reach the Corps' contention that Circle failed to comply with the notice provisions of the Changes clause.

29